IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PARKE BANCORP INC., D/B/A PARKE BANK, | § § § | |
| | § | No. 4, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. N17C-05-114 |
| 659 CHESTNUT LLC. | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: August 21, 2019
Decided: September 12, 2019

Before **STRINE**, Chief Justice; **SEITZ** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED AND REMANDED**.

Don A. Beskrone, Esquire, Benjamin W. Keenan, Esquire, ASHBY & GEDDES, P.A., Wilmington, Delaware for Appellant Parke Bancorp Inc.

Kevin J. Mangan, Esquire, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware, for Appellee 659 Chestnut LLC.

**TRAYNOR**, Justice:

This case concerns a $3.375 million loan that Parke Bancorp ("Parke") made to 659 Chestnut LLC ("659 Chestnut") in 2016 to finance the construction of an office building in Newark, Delaware. 659 Chestnut pleaded a claim in the Superior Court for money damages in the amount of a 1% prepayment penalty it had paid under protest when it paid off the loan. The basis of 659 Chestnut's claim was that the parties were mutually mistaken as to the prepayment penalty provisions of the relevant loan documents. In particular, 659 Chestnut alleged that (1) the parties had agreed to a time window in which 659 Chestnut could prepay the loan without any prepayment penalty (hereinafter the "no-penalty window") and (2) the final, signed loan documents erroneously did not contain such a window. Parke counterclaimed for money damages in the amount of a 5% prepayment penalty, which it claims was provided for in the agreement. After a bench trial, the Superior Court agreed with 659 Chestnut and entered judgment in its favor.[1]

We reverse and direct the entry of judgment in Parke's favor on 659 Chestnut's claim. Although Parke loan officer Timothy Cole negotiated on behalf of Parke and represented to 659 Chestnut during negotiations that there was a no-penalty window, the parties stipulated that (1) everyone knew that Cole did not have authority to bind Parke to loan terms and (2) everyone also knew that any terms proposed by Cole

---

[1] *659 Chestnut LLC v. Parke Bancorp Inc.*, 2018 WL 6432984 (Del. Super. Ct. Dec. 6, 2018) ("Opinion Below" hereafter).

required both final documentation and approval by Parke's loan committee.[2] Nevertheless, when conducting its analysis of whether Parke was mistaken, the Superior Court examined the pre-closing understanding of Cole rather than that of the loan committee, whose knowledge, in our view, is what mattered. And when we turn the lens to the loan committee, it is evident that 659 Chestnut did not offer clear and convincing evidence that Parke's loan committee agreed to something other than the terms in the final loan documents. Accordingly, we direct the entry of judgment for Parke.

## I. BACKGROUND

659 Chestnut is a holding company controlled by Steven Fasick, an experienced developer who had purchased a lot at 659 East Chestnut Hill Road in Newark to build a facility for Recovery Innovations International, Inc. ("Recovery Innovations"). Recovery Innovations, of which Fasick is a director, had contracted with the State of Delaware to provide drug-abuse treatment services. The State was under pressure from the federal government to expand its services, and in turn, Recovery Innovations was under pressure from the State to move quickly.

---

[2] Pretrial Stipulation ¶ (II)6, *659 Chestnut LLC v. Park Bancorp Inc.*, N17C-05-114 (Oct. 25, 2018) Dkt. No. 39, available at App. to Opening Br. A683–715 ("A__" hereafter).

## A. 659 Chestnut seeks a loan

Although Fasick and his business partner had made some progress with their own funds, they began receiving threats that they "were going to lose [their] program and [their] agreement with the State if [they] were not able to get this thing up and running very quickly."[3]  Fasick looked to Parke for a loan to expedite construction. The loan would be a "construction/permanent" loan.[4]  As a general matter, a construction loan is a short-term obligation used during the construction of a building.  After construction is complete, property owners often obtain longer-term financing, called permanent loans,[5] to refinance the short-term construction loan. The parties agree that the permanent financing was "optional,"[6] but they do not agree on the precise nature of that optionality.

During his negotiations with Parke, Fasick primarily worked with Cole, who was one of Parke's sales representatives.  As noted, the parties stipulated that "both Cole and Fasick understood during the course of their negotiations that the terms they discussed were only [p]roposed [t]erms, and the [p]roposed [t]erms required both final documentation and approval by [Parke's] loan committee . . . to become binding on [Parke]."[7]

---

[3] Pretrial Stipulation, *supra* note 2, at ¶ (II)3.
[4] *Id.* at ¶ (II)4.
[5] Permanent loans are generally not perpetual as the term "permanent" would seem to indicate; rather, they simply have longer maturities than short-term construction loans.
[6] *Id.*
[7] *Id.* at ¶ (II)6.

## B. Reaching an agreement

Around February 10, 2016, Cole prepared initial drafts of a set of loan terms. Although these draft terms generally required Fasick to pay a penalty should 659 Chestnut prepay the loan, one of the terms gave Fasick a 90-day window at the end of a defined "Construction Period" during which Fasick would be able to repay the construction loan without any prepayment penalty ("90-day window"). A draft loan application (these loan applications are also referred to as "term sheets") and a draft transaction summary provided for the 90-day window using the following language:

> Borrower to be allowed 90 days following issuance of a [certificate of occupancy] to refinance the construction loan without prepayment penalty.[8]

Cole shared these terms with Fasick and with his supervisor, Parke chief credit officer Paul Palmieri. In response, Palmieri told Cole that the 90-day window was unacceptable and that Cole "had to" take it out.[9]

On February 18, 2016, Cole sent Fasick a revised loan with a set of new proposed terms by email. This email reminded Fasick that the terms were subject to approval by Parke's loan committee.

In relevant part, the loan application provided as follows:

---

[8] A33; A38.
[9] A936–37.

<u>Construction Period</u> is defined as the period of time from Closing until issuance of the [certificate of occupancy] and the Commencement of Rent. . . .

| **Term** | Construction Loan: 12 Months<br>Permanent Loan Option: 10 Years |
|---|---|
| **Prepayment Penalty** | Construction Loan: 1% of the Commitment Amount (outstanding principal balance plus remaining availability) during the Construction Period as defined previously in this Term Sheet |
| | Permanent Loan: 5% year 1, 4% year 2, 3% year 3, 2% year 4 and 1% year 5 repeated for the renewal term. |

These terms differ materially from those in the February 10 loan application and transaction summary that Cole had shared with Fasick and Palmieri, respectively. Most notably for our purposes, these new terms omit any explicit mention of the 90-day window or any other no-penalty window. Despite this obvious omission, Fasick "viewed the[] [new] [p]roposed [t]erms favorably"[10] because he saw them as providing, in his words, "essentially zero percent financing on a construction perm[anent] loan which nobody does."[11] And even though there was no explicit mention of a no-penalty window, Fasick thought that the terms, as a

---

[10] *Opinion Below*, 2018 WL 6432984, at *2.

[11] Pretrial Stipulation, *supra* note 2, at ¶ (II)7. It appears by "zero-percent financing," Fasick means something like "zero-percent equity financing," *i.e.*, that he would not have any of his own money invested in the building after it was built and not that the financing was at zero percent interest. *See* A512; A878–80.

practical matter, would still give him a no-penalty window after he finished construction but before the construction loan matured.

By way of explanation, Fasick (and apparently Cole) understood the no-penalty window to be derived from the loan terms as follows: (1) 659 Chestnut would receive a construction loan for 12 months, with a 1% prepayment penalty to apply during the defined Construction Period; (2) after the Construction Period ended, the prepayment penalty would also end, but the loan would continue to operate as a construction loan and would not need to be paid or refinanced until the 12-month maturity period ended; (3) accordingly, if the Construction Period ended before the 12-month term of the construction loan expired, there would be no prepayment penalty for the balance of the construction loan term; and (4) only if 659 Chestnut affirmatively were to opt to roll over the construction loan into a permanent loan would the permanent loan terms (including the permanent loan prepayment penalties) apply.[12] It is therefore crucial to 659 Chestnut's position that the loan

---

[12] For example, if the loan closed on January 1, 2016 and the Construction Period ended on September 1, 2016, then from September 2, 2016 until December 31, 2016, 659 Chestnut could repay the loan without any prepayment penalty.

terms provide for a borrower option and do not provide for an automatic conversion from the construction loan to the permanent loan.

At any rate, Fasick recognized that the prepayment penalty term had been substantially revised, and—despite his meandering interpretation of the loan terms or perhaps because of it—Fasick was concerned that the new language "wasn't clear enough."[13] He wanted to confirm his understanding that there was a no-penalty window with Cole before signing the loan application and wrote back to Cole with his understanding of the loan terms:

> I believe it reads that the prepayment penalty exists only for the defined "construction period" and then ends. Then there's a gap with no prepay during the period between the [issuance of the certificate of occupancy]/rent commencement time and the end of the 12 month loan period. Also, during that period after occupancy im paying interest plus $2,000 (and no prepay penalty) for up to 12 months while i have the option to convert to the perm. . . . So, the key is that it gives me a window between [the issuance of the certificate of occupancy] and accepting a perma[nent loan] where im not penalized to pay it during that window. I believe Im reading it right and yes that works great. . . . Let me know if I understand the language the way you intended it.[14]

> Cole replied:

> Yes. You are reading it correctly. I need to obtain the final approval of the loan committee, but this is the exact wording in the revised loan approval package.[15]

---

[13] A881.
[14] A92.
[15] *Id.*

The proposed terms from the loan application were then transcribed into a transaction summary dated February 22, 2016. The loan application was to be reviewed and signed by the borrower, while the transaction summary was to be used by Parke's attorneys as the basis for preparing the final loan documents and reviewed by Parke's loan committee for final loan approval. On February 22—ten days before closing—Parke's attorneys forwarded drafts of the final loan documents to Cole, Fasick, and Gary Bryde, an attorney for 659 Chestnut. Bryde testified that he likely did not review the documents and terms with Fasick because of Fasick's experience and knowledge.

Unlike the loan application or transaction summary, which are arguably subject to varying interpretations, the drafts of the final loan documents unambiguously did not provide for a no-penalty window. Among other things, the final loan documents did not contain any reference to an option to convert the construction loan into a permanent loan, but rather stated that "the Loan *shall* convert to an amortizing, permanent loan . . . ."[16] What is more, the loan note stated that there would be a 1% prepayment penalty "[d]uring the Construction Loan" rather than during a defined "Construction Period" that ends upon the issuing of a certificate of occupancy and the commencement of rent.[17] Finally, the loan note

---

[16] *Opinion Below*, 2018 WL 6432984 at *3; A292 (emphasis added).
[17] A293; Pretrial Stipulation, *supra* note 2, at ¶ (II)9.

provided for a 5% prepayment penalty during the first year of the permanent loan period, and decreasing amounts thereafter.

Cole received the draft documents and, in his trial testimony, claimed that he attempted to correct the prepayment provisions consistent with his understanding with Fasick. His handwritten notes on the loan document changed the prepayment penalty to be owed only "[d]uring the Construction Period."[18] Although Cole said that it was his "general practice" to call Parke's attorneys with his proposed changes,[19] he had no specific recollection of making such a call, and Parke's attorneys likewise have no specific recollection of receiving such a call. Nor is there any indication that anyone at Parke received Cole's notes or notice of his concerns. Based on these facts, the Superior Court would find that Cole mistakenly believed that Parke's attorneys had made the changes to the execution version of the loan documents.

On March 3, 2016, Parke's loan committee, which included Cole's supervisor Palmieri (who, we emphasize, had told Cole that the 90-day window was unacceptable), heard a presentation from Cole on the loan and approved the loan "as set forth"[20] in the February 22, 2016 transaction summary. Although Fasick believed that the terms in the loan application (which were essentially identical to those in the

---

[18] *Opinion Below*, 2018 WL 6432984, at *5.
[19] *Id.* at *6; A790.
[20] Pretrial Stipulation, *supra* note 2, at ¶ (II)9.

10

transaction summary) provided for a no-penalty window, Parke argues that its loan committee reasonably did not believe that the transaction summary provided for a no-penalty window.

## C. The loan closes and the relationship sours

On March 4, the day after Parke's loan committee approved the loan, 659 Chestnut (as represented by Fasick) and Parke (as represented by Cole) signed the loan documents and closed the loan. Cole did not read any of the loan documents at the closing table. More remarkably, despite his recognition that the explicit 90-day window had been removed from the initial term sheet, his concern that the February 18 loan application was unclear on this key point, and his receipt of the final loan documents 10 days before closing, Fasick said that he never read any of the loan documents prior to signing. 659 Chestnut's attorney witnessed and notarized Fasick's signature.

In May or early June 2016, after the loan had been fully funded and construction was well under way, Fasick decided to review the loan documents and himself discovered the discrepancy between the loan documents and his purported understanding of the loan terms. On or about June 20, Fasick contacted Parke about reforming the loan documents to reflect his understanding. Fasick and Parke were not able to reach an agreement to reform the documents or to renegotiate the loan terms.

Recovery Innovations began payment of rent on July 1, 2016, and New Castle County issued a certificate of occupancy for 659 Chestnut's new building on October 17, 2016.

On October 21, 2016, 659 Chestnut sent Parke payment for the loan, including a 1% prepayment penalty of $33,750. 659 Chestnut's attorney informed Parke that the "payoff is with reservation of all rights with regard to the prepayment penalty as our position is that it is not owed . . . ."[21]

On October 24, 2016, Parke marked the loan note as "paid" and tendered the note back to 659 Chestnut, which accepted the note. On November 22, 2016, Parke recorded a mortgage satisfaction releasing its lien on 659 Chestnut's property and sent a record of that to Fasick.

On May 8, 2017, 659 Chestnut filed this suit against Parke seeking to recoup the 1% penalty it had paid under protest. Parke filed a $135,000 counterclaim arguing that 659 Chestnut should have paid a 5% prepayment penalty instead of a 1% prepayment penalty because the construction loan had converted into a permanent loan with an attendant 5% penalty.

---

[21] *Opinion Below*, 2018 WL 6432984, at *6.

## D. The Superior Court's opinion

In a post-trial opinion, the Superior Court found that the prepayment penalty provisions in the contract between 659 Chestnut and Parke were unenforceable by reason of mutual mistake. That opinion contains several items of note.

First, although the Superior Court cited our order in *Hicks v. Sparks*[22] for the proposition that "a contract is *voidable* on the grounds of mutual mistake existing at the time of contract formation,"[23] it is evident that the Superior Court did not void the contract but rather only reformed it.

Second, as mentioned in the introduction, the Superior Court appears to have held that Cole's understanding of the agreement was the relevant human understanding for determining what Parke's corporate understanding of the agreement was. This was so even though the parties stipulated that only the Parke loan committee—not Cole—had the power to bind the bank to loan terms and that any terms proposed by Cole were subject to final documentation and the loan committee's approval. The Superior Court did not make any direct findings as to what terms the loan committee believed it had approved, although its findings

---

[22] 2014 WL 1233698, at *2, 89 A.3d 476 (Del. 2014) (Table).
[23] *Id.*

13

imply—but do not explicitly hold—that the transaction summary as written contained a no-penalty window.[24]

Third, the Superior Court also found that there should have been a buyer-exercisable option to convert the construction loan into a permanent loan. As discussed above, this option is critical to 659 Chestnut's no-penalty-window interpretation of the loan terms. The Superior Court does not make it clear what underlying facts constituted the basis of its finding, but its earlier findings of fact relating to the option are as follows:

- "The Summary contains four references to 'Permanent Loan Option.'"

- "An attorney with the law firm that drafted the loan documents testified that 'Option' means choice."

- "Additionally, the documents do not make clear whether the choice to convert from construction to permanent loan is the lender's or the borrower's."

- "[A]n option to convert is not standard Bank practice."[25]

Fourth, the Superior Court did not attempt to reconcile Fasick's failure to read the final loan documents with his apparent clear understanding that the explicit reference to the no-penalty window had been omitted from the February 18 term

---

[24] The Superior Court's statement that the Transaction Summary constituted evidence of an agreement containing a no-penalty window, *Opinion Below*, 2018 WL 6432984, at *6, leads us to believe that the Superior Court understood that the Transaction Summary included a no-penalty window.

[25] *Id.* at *5.

sheet. Nor did the Superior Court attempt to reconcile Cole's failure to read the final loan documents with Cole's actual knowledge that the last draft of the final loan documents that he had seen did not provide for a no-penalty window.

Finally, the Superior Court found that 659 Chestnut did not assume the risk of the mistake despite Fasick's failure to read the loan documents because "the time frame was extremely tight and there was no notice (other than the [loan] documents) that [Parke]'s loan committee had not approved the [no-]penalty window" and because Fasick testified that Cole reassured him that the loan documents were accurate.[26]

The Superior Court ultimately awarded 659 Chestnut the prepayment penalty that it had paid under protest. Parke appeals that decision to us.

## II. STANDARD AND SCOPE OF REVIEW

We review the Superior Court's findings of fact for clear error.[27] We review the Superior Court's legal conclusions *de novo*.[28] We review questions of contract interpretation *de novo*.[29]

"To succeed in a claim for contract reformation, the "plaintiff must show . . . that the parties came to a specific prior understanding that differed materially from

---

[26] *Id.* at *7.
[27] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015).
[28] *Id*.
[29] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).

the written agreement."[30]  Claims for contract reformation require proof by clear and convincing evidence.[31]  "The clear and convincing standard requires evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable."[32]

## III. ANALYSIS

On appeal, Parke raises a number of arguments.  But because the Superior Court's selection of the incorrect agent when analyzing Parke's pre-closing understanding of the relevant contract terms is dispositive, we focus on that issue and do not address the merits of Parke's other arguments on appeal.

**A. That this case is a reformation claim and not an avoidance claim diminishes the import of Fasick's failure to read the final loan documents**

Before we reach the parties' arguments, we first note that the Superior Court and the parties appear to have approached 659 Chestnut's claim as one for avoidance rather than reformation.  Although avoidance and reformation are similar in many ways, they differ in their treatment of a plaintiff's failure to read the contract documents.  Because several of Parke's arguments below and on appeal revolve around Fasick's failure to read, we review the distinction between avoidance and reformation and the effects of that distinction.

---

[30] *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 890–91 (Del. 2015) (citing *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del. 2002)).
[31] *Id.* at 891.
[32] *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002) (internal quotations and brackets omitted).

16

While avoidance and rescission[33] involve attempting to "unmake" an agreement and "return[ing] the parties to the *status quo* [*ante*], reformation entails an attempt to "correct[] an enforceable agreement's written embodiment to reflect the parties' true agreement."[34] And here, the remedy sought—a remedy that the Superior Court granted—was not the total abrogation of the parties' agreement. Instead, the essential precondition of 659 Chestnut's claim for money damages was the reformation of the contract to include a no-penalty window so that it would "reflect the parties' true agreement."[35]

The elements of avoidance and reformation claims are similar in many ways, but there are some important differences. To succeed on an avoidance claim, a plaintiff must show that:

(1) there was a mutual mistake that relates to a basic assumption on which the contract was made,

(2) the mistake has a material effect on the agreed exchange of performances, and

(3) it did not bear the risk of mistake.[36]

---

[33] In this context, avoidance and rescission are identical. *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 677 n.37 (Del. 2013) (citing *Black's Law Dictionary* 156, 1420–21 (9th ed. 2009)).

[34] *Id.* at 677.

[35] *See* Complaint ¶ 25–36, *659 Chestnut LLC v. Park Bancorp Inc.*, N17C-05-114 (May 8, 2017) Dkt. No. 1. As paragraph 29 of the Complaint particularly states, "The Plaintiff and the Defendant reached a definite agreement before executing the Loan Documents. The Loan Documents failed to incorporate the terms agreed upon by the Plaintiff and Defendant." The parallels between that paragraph and the elements of a reformation claim, *infra*, are unmistakable.

[36] *Hicks*, 2014 WL 1233698, at *2.

In contrast, to succeed in a reformation claim based on—as here—an alleged scrivener's error, the plaintiff must show that:

(1) the parties came to a specific prior understanding

(2) that differed materially from the written agreement.[37]

Despite the different wording, the claims are substantially similar when considered in context. Although avoidance states its elements in terms of a mistaken assumption and reformation in terms of a prior understanding, one "assumption" that parties make is that their prior understanding will be accurately reflected in the written documents. If that assumption were to be a mistaken one, then enforcing the written agreement would have a material effect on the exchange of performances.

One substantive and relevant difference between the two claims, though, is that assumption of risk—or, rather, the absence of it—is not an element of reformation claims but rather a defense of sorts. Thus, while a failure to read prevents a plaintiff from proceeding with an avoidance claim as a *prima facie* matter,[38] a failure to read bars a reformation claim only if "[the plaintiff's] fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing."[39]

---

[37] *Supra* note 30.
[38] *Scion Breckenridge*, 68 A.3d at 677 ("a party cannot seek avoidance of a contract he never read" (emphasis omitted)).
[39] *Id.* at 676 (quoting Restatement (Second) of Contracts § 157 (1981)).

18

Here, of course, 659 Chestnut's representative, *i.e.*, Fasick, did not read the final contract documents. The Superior Court, applying an avoidance framework, held that Fasick's failure-to-read was immaterial. Under a traditional avoidance framework, it was error for the Superior Court to overlook Fasick's failure-to-read. But because the remedy that 659 Chestnut sought was not avoidance but rather reformation, Fasick's failure-to-read only bars 659 Chestnut's claim if the failure-to-read was in bad faith, something that Parke has not argued. Accordingly, while Parke is correct to contend that an avoidance claim is facially barred by a plaintiff's failure to read the contract, that does not help Parke here because 659 Chestnut is not in fact seeking avoidance. That said, although Fasick's failure to read the contract is not in itself dispositive of 659 Chestnut's reformation claim, that failure to read nevertheless substantially compromises the claim that the contract as written differed from what the parties had agreed upon. When an experienced party does not bother to read what he knows will be the binding agreement, a court must be exceedingly careful before allowing him to escape the consequences of that agreement, lest the court undercut the reliability of all written contracts, a reliability critical to their important role in facilitating useful commercial relations.

## B. The evidence did not clearly and convincingly show that Parke's loan committee approved a no-penalty window

Parke argues that the Superior Court erred by finding a mutual mistake because the evidence did not clearly and convincingly show that the two parties were

19

mistaken as to a basic assumption and that Fasick had assumed the risk of mistake—the first and third elements of a contract avoidance claim based on mutual mistake. But because this claim is in fact one for reformation, not avoidance, our analysis proceeds in a slightly different manner. Reformation is based on expressed intent,[40] and a reformation claim requires the plaintiff to show "that the parties came to a specific prior understanding that differed materially from the written agreement."[41] We conclude that 659 Chestnut has not shown by clear and convincing evidence that Parke expressed an intent to agree to loan terms that differed from the terms in the written agreement. Accordingly, 659 Chestnut's damages claim, based as it is on the reformation of that agreement, should fail.

> i. *Whose understanding is relevant*

As an artificial entity, Parke's actions ultimately are conducted through and by its agents. Parke can only "come to a specific prior understanding" if one of its agents, acting under actual or apparent authority, came to that understanding. Accordingly, we must determine whether Cole or, instead, the loan committee had such authority. We conclude that only the loan committee had authority and, thus, Cole's beliefs about any of Parke's supposed prior understandings are insufficient to prove the terms of that understanding.

---

[40] *Collins v. Burke*, 418 A.2d 999, 1003 (Del. 1980).
[41] *Supra* note 30.

20

Under the common law of agency, there are two main forms of authority: actual authority and apparent authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."[42] Apparent authority, by contrast, "is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."[43]

Actual or apparent authority must be present if a plaintiff is to use the agent's actions or beliefs as the bases of mistake or fraud claims against the principal. For example, in the Texas case *Gaines v. Kelly*,[44] a mortgage broker assured a borrower that a loan was "a done deal,"[45] but the loan ultimately fell through. The borrower sued the lender on contract and fraud theories based on his supposed reliance on the

---

[42] *Harmon v. State, Delaware Harness Racing Comm'n*, 62 A.3d 1198, 1201 (Del. 2013) (quoting Restatement (Third) of Agency § 2.01 (2006)).

[43] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 799 (Del. Ch. 2014) (quoting Restatement (Third) of Agency § 2.03).

[44] 235 S.W.3d 179, 181 (Tex. 2007); *see also Limestone Realty Co. v. Town & Country Fine Furniture & Carpeting, Inc.*, 256 A.2d 676 (Del. Ch. 1969) ("too good to be true" offer not binding on principal where counterparty had good reason to suspect that agent made offer in excess of agent's actual authority and where offer was in fact in excess of agent's actual authority).

[45] *Id.* at 182.

broker's statement, but the Texas Supreme Court held that no claim could lie against the lender because the broker lacked authority to commit the lender to a loan.[46]

In this case, Cole had neither actual nor apparent authority to approve a no-penalty window.[47] The parties stipulated that Cole could not himself bind Parke to a transaction, *i.e.*, that Cole lacked actual authority. Furthermore, the parties stipulated that both Fasick and Cole knew that Cole lacked such authority during the course of negotiation, *i.e.*, that Cole also lacked apparent authority. Rather, only Parke's loan committee could come to an agreement with a borrower. Therefore, when considering whether Parke and 659 Chestnut had come to a prior agreement and what terms any such prior agreement entailed, Cole's understanding and knowledge are irrelevant.

Indeed, it seems that even the parties agree that Parke's loan committee is the relevant entity for analysis when inquiring into Parke's corporate understanding of the agreement. For example, Parke argues that "Cole was not [Parke]'s agent"[48] and that the finding of mistake on Parke's part is contrary to the parties' stipulation that "the [p]roposed [t]erms required both final documentation and approval by [Parke]'s

---

[46] *Id.* at 185; *see also Luddington v. Bodenvest Ltd.*, 855 P.2d 204 (Utah 1993) (holding no contract existed when partner's acts exceeded actual and apparent authority).

[47] It may well be that Cole's statements are attributable to Parke for purposes of a misrepresentation claim, *see Dick v. Reves*, 206 A.2d 671, 675 (Del. 1965), but this appeal does not involve a misrepresentation claim.

[48] Opening Br. 39.

22

loan committee . . . to become binding on [Parke]."[49]  Likewise, 659 Chestnut's focus on the loan committee's approval of the transaction summary[50] suggests that it also believes that the relevant understanding here is that of Parke's loan committee and not that of Cole.

### ii.   Parke's mistake (or lack thereof)

In our view, the evidence was not clear and convincing that Parke's loan committee—the proper focal point for our analysis—approved a no-penalty window. As an initial matter, the records of what happened during the loan committee meeting do not indicate that the loan committee considered, much less approved, a no-penalty window.  The loan committee approved the loan as set forth in the transaction summary after hearing a presentation from Cole.  But there was no evidence that Cole ever brought up a no-penalty window during his presentation and no evidence that the loan committee discussed a no-penalty window.

Even more compelling than what *did not* occur is what *did* occur.  It is uncontroverted that Palmieri, who was Cole's supervisor *and a Parke loan committee member*, instructed Cole to remove the original 90-day window from the

---

[49] *Id.* at 38 (citing Pretrial Stipulation, *supra* note 2, at ¶ (II)6).

[50] *See* Answering Br. 8–10, 29–30 ("The Loan Committee approved the terms and conditions of the Loan on March 3, 2016 as set forth in the Transaction Summary dated February 22, 2016. . . . Accordingly, the Loan Committee approved a loan to 659 that, among other things, allowed 659 to pay off the Loan after the end of the Construction Period and before the end of the Construction Loan Term, without having to pay a prepayment penalty. . . . [Parke] barely mentions the words "Transaction Summary" – presumably because [Parke] knows that the Transaction Summary – the document approved by Loan Committee on March 3 . . . – is fatal to this appeal.").

23

initial term sheet. It is uncontroverted that Cole removed the original 90-day window. It is uncontroverted that it was Parke's customary practice to automatically convert construction/permanent loans from construction to permanent status upon completion of the construction. And, as explained earlier, this automatic conversion effectively would have eliminated the window that Faisck though was created by the borrower's "option" to convert. It is uncontroverted that Palmieri generally would not approve no-penalty windows. And it is uncontroverted that Parke's lawyers, who converted the transaction summary into formal loan documents, did not understand the transaction summary to provide for a no-penalty window. Each of these facts weighs heavily against the idea that Parke's loan committee intended to approve a no-penalty window or understood the transaction summary to provide for one.

659 Chestnut also did not proffer sufficient evidence supporting its contention that the transaction summary did not call for the automatic rollover of the construction loan into a permanent loan—especially when viewed under the clear-and-convincing standard. Contrary to 659 Chestnut's contention, we do not think that the word "option" in "construction loan option" necessarily means that the loan committee understood the transaction summary to provide for a construction loan that rolls over into a permanent loan at, and only at, the election of the borrower. First, as the Superior Court itself found, "[t]he documents do not make clear whether the choice to convert from [a] construction to permanent loan is the lender's or the

24

borrower's."[51]  Based on the record before us and given that "an option to convert is not standard [Parke] practice,"[52] it is not even clear whether the word "option" meant anything at all to the loan committee.  Second and relatedly, Parke also makes the reasonable argument that the phrase "construction loan option" is properly understood to be "optional" only in the sense that the borrower can, at his option, pay off the construction loan before it automatically rolls over to a permanent loan (with a prepayment penalty, of course).  As Parke argues, the word "option" need not relate to what happens when the defined construction period is over, and it was reasonable for the loan committee to understand that the construction loan would automatically roll over at the end of the construction period.  Parke's interpretations are not unreasonable, but we need not decide whether they are the most reasonable because the burden of proof lies with 659 Chestnut, and 659 Chestnut has failed to

---

[51] *Opinion Below*, 2018 WL 6432984, at \*5.

[52] *Id.*  Because the transaction summary does not constitute a contract or agreement, our consideration of extrinsic evidence to determine the loan committee's understanding of the transaction summary does not conflict with, much less modify, the usual rules that (1) Delaware courts "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions" and (2) "contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quotations and citations omitted); *see also Itek Corp. v. Chicago Aerial Indus., Inc.*, 274 A.2d 141, 143 (Del. 1971) (party's intent behind letter of intent a question of fact for a jury and an issue on which expert testimony may be appropriate); *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998) ("[t]he intent of the parties is generally a question of fact").

clearly and convincingly show that the transaction summary provided for a no-penalty window, much less that the loan committee understood it to provide for one.

Accordingly, although a trial court's findings of fact generally receive substantial appellate deference,[53] there is simply not enough record support for the Superior Court's findings here for us to affirm those findings. Particularly given the clear-and-convincing standard that applies to this case, the evidence does not suffice to allow a sophisticated party assisted by counsel to escape the clear consequences of an unambiguous contract that it has willingly signed.

## C. Parke did not press its counterclaim on appeal in the main text of its brief and has thus waived enforcement of the contract as signed

Parke also filed a counterclaim for an additional 4% prepayment penalty because the loan documents indicated that, by the time 659 Chestnut paid off its loan, the loan had converted into a permanent loan with a 5% prepayment penalty. This claim was not pressed on appeal—the only mentions of it reside in one footnote of Parke's Opening Brief[54] and a cursory clause in the Conclusion.[55] It is a plainly stated rule of this Court that "[f]ootnotes shall not be used for argument ordinarily included in the body of a brief or for the purpose of avoiding [] page limitations."[56]

---

[53] *Powell v. Dep't of Servs. for Children, Youth & their Families*, 963 A.2d 724, 731 (Del. 2008). *But see Waters v. Div. of Family Servs.*, 903 A.2d 720, 727 (Del. 2006) (appearing to apply a *de novo* standard to clear and convincing evidence review).
[54] Opening Br. at 46 n.148.
[55] Opening Br. at 47.
[56] Supr. Ct. R. 14(d); *see also Murphy v. State*, 632 A.2d 1150, 1152 n.2 (Del. 1993).

26

Nor may arguments be properly raised in the Conclusion of a brief.[57] Here, a single footnote in a page-limited brief was all that Parke provided to preserve its counterclaim. Although the consequences of our decision would ordinarily have resulted in the enforcement of the contract as-written—giving Parke its requested 5% prepayment penalty—Parke has waived its claim for enforcement, and we accordingly enter judgment in its favor only on 659 Chestnut's claim.

## IV. CONCLUSION

"When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement."[58] 659 Chestnut has failed to provide clear and convincing evidence that Parke's loan committee understood the terms of the transaction summary it approved to provide for a no-penalty window. To the contrary, the evidence points distinctly in the other direction. And in the absence of a specific prior (*i.e.*, preclosing) understanding of the loan agreement's prepayment penalty provisions that differed materially from the signed loan documents, 659 Chestnut's reformation claim based on mutual mistake must fail. Accordingly, we reverse the judgment of the Superior Court and

---

[57] Supr. Ct. R. 14(b)(vi)(A)(3) ("The merits of any argument that is not raised *in the body of the opening brief* shall be deemed waived and will not be considered by the Court on appeal") (emphasis added).

[58] *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005), *rev'd on other grounds*, 892 A.2d 1068 (Del. 2006) (cited by *Nationwide Emerging Managers*, 112 A.3d at 881)).

remand with instructions to enter judgment in favor of Parke consistent with the rulings in this opinion.